# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| SALT MEADOWS HOMEOWNERS ASSOCIATION, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. S17C-05-018 RHR |
| ZONKO BUILDERS, INC., | ) ) ) | |
| Defendant/Third-Party Plaintiff. | ) ) ) | |

Submitted: October 27, 2022
Decided: January 31, 2023

## DECISION ON POST-TRIAL MOTIONS

Upon Defendant's Motion for New Trial or Remittitur,
GRANTED in part and DENIED in part.

Upon Defendant's Renewed Motion for Judgment as a Matter of Law Pursuant to
Delaware Superior Court Civil Rule 50(b), GRANTED.

Upon Plaintiffs' Motion for Costs and Interest,
GRANTED in part and DENIED in part.

Shannon D. Humiston, Esquire, Daniel M. Silver, Esquire, Matthew J. Rifino, Esquire, McCarter & English, LLP, Wilmington, Delaware, *Attorneys for Plaintiffs Salt Meadows Homeowners Association, Inc., et al.*

Colin M. Shalk, Esquire, Kenneth M. Doss, Esquire, Casarino Christman Shalk Ransom & Doss, P.A., Wilmington, Delaware, *Attorneys for Defendant Zonko Builders, Inc.*

ROBINSON, J.

Trial in this matter took place in May 2022 and the parties have filed several post-trial motions. Defendant Zonko Builders, Inc. filed a Motion for a New Trial or Remittitur and a Renewed Motion for Judgment as a Matter of Law. Plaintiffs filed a Motion for Costs and Interest.

## I. BACKGROUND AND PROCEDURAL POSTURE

Salt Meadows is a twenty-unit condominium complex consisting of five separate buildings, each containing four townhome units, located in Fenwick Island, Delaware. Plaintiffs are the individual unit owners and the homeowners' association (collectively, "Plaintiffs"). Defendant, Zonko Builders, Inc. ("Zonko"), is the contractor that oversaw construction of the project.

Construction of Salt Meadows began in September 2004 and the final certificate of occupancy was issued in April 2007. In February 2016, a homeowner discovered extensive water damage in her unit. After consulting with several engineers and contractors, Plaintiffs began the long—and still ongoing—process of repairing the buildings.

Plaintiffs filed suit in May 2017 alleging four counts: negligent construction, breach of contract, breach of express warranty, and breach of implied warranty. Among many pretrial motions, Plaintiffs filed a motion for partial summary judgment. At oral argument on this motion, this court found that Plaintiffs had

1

established negligence,[1] but ordered further briefing as to the question of damages. This court eventually denied the partial motion for summary judgment as to damages.[2]

This case is unusual because the repair work is ongoing. Even with the pandemic-related delays in getting this matter to trial, Plaintiffs claimed that only a small percentage of the damage has been repaired and they sought past and future damages. As of the date of trial, Plaintiffs had paid approximately $2.4M for repairs that were made between June 2016 and April 2021.[3] The parties largely agreed that amount was appropriate, and it was not seriously challenged by Zonko. The main issue for the jury, then, was the amount of future damages. Plaintiffs argued that only a small amount of the necessary repairs had been completed and that a significant amount of future damages was needed. Zonko's position at trial was that all the necessary repairs were largely finished and that no further expenses were due beyond the $2.4M that was already incurred.

The trial began on May 2, 2022. Plaintiffs called three witnesses: Kathy Lambrow ("Lambrow"), a unit owner and president of the homeowners association; Mike Lewis ("Lewis") of Custom Carpentry, LLC who was the contractor

---

[1] Transcript of Oral Argument Dec. 11, 2020 at 2, 5-6, 14-15, *Salt Meadows Homeowners Assoc., Inc. v. Zonko Builders, Inc.*, (C.A. No. S17C-05-018) (D.I. 191).

[2] *Salt Meadows Homeowners Assoc., Inc. v. Zonko Builders, Inc.*, 2021 WL 2181426 (Del. Super. May 27, 2021). The finding was clarified by a stipulated order dated September 20, 2021.

[3] The exact figure was $2,458,071.00.

performing the repairs on the buildings; and Jeremy Walbert, P.E., ("Walbert") a civil engineer from the Becker Morgan Group who consulted with the homeowners association and Lewis. Zonko called one witness, its expert, Jason Boyd, P.E. ("Boyd").[4] On May 12, the jury found in favor of Plaintiffs. The jury verdict form provided two lines for damages: one for general damages, where the jury awarded Plaintiffs $11.3M, and one line for future repairs to various columns, where the jury awarded Plaintiffs $1.6M.

## II.     DISCUSSION

### A.     ZONKO'S MOTION FOR NEW TRIAL AND REMITTITUR

Zonko has filed a Motion for a New Trial or Remittitur for the general damages awarded. Zonko argues that the jury improperly considered testimony about inflation to award Plaintiffs more than what they were asking for. Lewis prepared an estimate dated March 15, 2019 that reflected it would cost $8.3M to complete all of the work. At the time of trial, Plaintiffs had spent approximately $2.4M to repair the most pressing damage. Lewis testified repeatedly that the March 15, 2019 estimate was imprecise, and that many of the future expenses were likely to be higher because of inflation and pandemic-era supply problems. Likewise, Walbert also testified that costs of materials were much higher than they were in March 2019 when the estimate was prepared. Zonko objected to the testimony about

---

[4] Boyd testified out of order because of a scheduling conflict.

inflation, arguing that neither Lewis nor Walbert were qualified to testify about inflation and that neither had previously offered an opinion about the impact of inflation on the March 2019 estimate.

## 1. Remittitur

I agree with Zonko that remittitur is warranted in this case. In considering remittitur, "the trial court must evaluate the evidence and decide whether the jury award falls within a supportable range."[5] Remittitur should be granted only when the damages are so excessive that the jury must have based its award on "passion, prejudice or misconduct, rather than on objective consideration of evidence presented at trial."[6] A jury's verdict with respect to damages is presumed to be correct, "unless it is so grossly disproportionate to the injuries suffered so as to shock the Court's conscience and sense of justice."[7]

There are two reasons to grant remittitur in this case. First, I agree with Zonko's speculation that the jury improperly added amounts for inflation in awarding $11.3M, which was $3M over Lewis's estimate. Testimony about inflation and added costs related to the pandemic were improperly put before the jury, albeit incrementally. Lambrow initiated this problematic line of testimony by testifying generally about the uncertainty of how much it would cost to complete

---

[5] *Reid v. Hindi*, 976 A.2d 125, 131 (Del. 2009) (citation omitted).
[6] *Barba v. Boston Sci. Corp.*, 2015 WL 6336151, at *9 (Del. Super. Oct. 9, 2015).
[7] *Maier v. Santucci*, 697 A.2d 747, 749 (Del. 1997).

the needed repairs and Zonko objected.[8] The court overruled the objection, finding that she could testify to the general nature of the difficulties in getting the work completed.[9] And, later in her testimony, she estimated that it would cost $500,000.00 for painting and cleanup that was not covered in Lewis's estimate.[10] She then later testified there was speculation that inflation would cause the costs to increase by 30%.[11] During his testimony, Lewis began to testify about how his estimate would be higher because of increased costs, and Zonko objected.[12] Zonko argued that Lewis was not an expert qualified to testify about inflation.[13] The court overruled the objection, noting that Lewis was the person who created the estimate that was the focus of trial and that his general testimony was admissible. Lewis testified that his then three-year-old estimate was imprecise and probably outdated. That testimony seemed proper at the time because Lewis was questioned extensively about how he arrived at the $8.3M estimate and whether it was an accurate reflection of what work needed to be performed. Later in his testimony, however, when asked about the general increase in costs and was specifically told

---

[8] Transcript of Trial – Vol. A at A–177-78, *Salt Meadows Homeowners Assoc., Inc. v. Zonko Builders, Inc.*, (C.A. No. S17C-05-018) (D.I. 272).

[9] *Id.* at A–178.

[10] Transcript of Trial – Vol. B at B–89, *Salt Meadows Homeowners Assoc., Inc. v. Zonko Builders, Inc.*, (C.A. No. S17C-05-018) (D.I. 271).

[11] *Id.* at B–214.

[12] Transcript of Trial – Vol. C at C–101, *Salt Meadows Homeowners Assoc., Inc. v. Zonko Builders, Inc.*, (C.A. No. S17C-05-018) (D.I. 270).

[13] *Id.* at C–108.

to not give an exact number, he testified that the costs had increased by 30%.[14] The court struck the answer, but the 30% figure from Lambrow's testimony was reinforced. It appears the jury improperly added 30% to the $8.3M and also improperly added the $500,000.00 claimed by Lambrow as an estimate for repairs not included in Lewis's estimate.

Second, I have considered the testimony and evidence presented at trial and find that the jury's verdict was excessive. While I disagree with Zonko's argument that all the work needed to repair the negligent construction at Salt Meadows has been completed, I find that a substantial amount of work has been completed since 2017. That repair work cost $2.4M as of the date of trial. I find that it is extremely unlikely that additional repair work will cost more than $8.3M total, based on the amount of work that has already been done for $2.4M. Also, I note that the $8.3M estimate was likely a worst-case scenario that assumed all the units were damaged equally. Considering the evidence presented at trial—such as the fact that the most serious repairs have already been made and that multiple units have not had any work done other than a partial new roof[15]—it is unlikely Plaintiffs will need even the remaining $5.9M to complete the repairs. The extra $3M awarded by the jury,

---

[14] *Id.* at C–112.
[15] Transcript of Trial – Vol. B at B–171.

over the already-high $8.3M figure, shocks the court's conscience and sense of justice. Therefore, the jury's award for general damages is reduced to $8.3M.

## 2. Motion for a New Trial

In its motion, Zonko argues that the court should grant a new trial if Plaintiffs do not accept remittitur to $8.3M.[16] Considering the above ruling on Zonko's request for remittitur, Zonko's request for a new trial is moot.

However, even if Zonko's motion was not moot, I find that there is no basis for a new trial. When reviewing a motion for new trial, the jury's verdict is entitled to "enormous deference."[17] "Traditionally, the court's power to grant a new trial has been exercised cautiously and with extreme deference to the findings of the jury."[18] Barring exceptional circumstances, this Court should not set aside a jury verdict unless "the evidence preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result."[19]

I find that there was sufficient evidence to support the bulk of the jury's verdict. The testimony and exhibits show that the damage to the units from Zonko's

---

[16] Def. Zonko Builders's Opening Br. on Def.'s Mot. New Trial or Remittitur at 10.

[17] *Young v. Frase*, 702 A.2d 1234, 1236 (Del.1997) (citing the Delaware Constitution, Art. IV, § 11(1)(a)).

[18] *Maier*, 697 A.2d at 749.

[19] *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979); *see also Burgos v. Hickok*, 695 A.2d 1141, 1145 (Del. 1997) (("[T]he trial judge should set aside a jury verdict pursuant to a Rule 59 motion only when the verdict is manifestly and palpably against the weight of evidence, or for some reason, justice would miscarry if the verdict were allowed to stand."(quoting *Storey*, 401 A.2d at 465)).

negligence was extensive and required significant repairs.[20] The evidence at trial was well-presented, only a few witnesses testified, and all the witnesses were very familiar with the problems and repairs at Salt Meadows. Therefore, there is no reason for a new trial.

## B.    ZONKO'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Zonko has filed a renewed motion for judgment as a matter of law pursuant to Superior Court Civil Rule 50(b) concerning the jury's award for future damages to certain columns in Salt Meadows. For the following reasons, Zonko's motion is GRANTED.

On March 5, 2020, Lewis discovered water damage to the columns supporting the rear deck at 40149 Salt Meadows Drive ("Unit 40149").[21] Lewis later noticed possible water damage to the columns at 40154 Salt Meadows Drive ("Unit 40154"). At his deposition on June 11, 2020, Lewis testified that all the columns in Salt Meadows would need to be investigated, but that he had not conducted any investigation beyond those two units. He acknowledged that he had

---

[20] One witness stated that when the siding was removed at one of the units, the underlying wood had the consistency of "mulch" in that it was soaking wet and crumbled easily. Transcript of Trial – Vol. E at E–190, *Salt Meadows Homeowners Assoc., Inc. v. Zonko Builders, Inc.*, (C.A. No. S17C-05-018) (D.I. 288).

[21] I recognize that "40149" refers to the address of the unit and that the actual unit numbers used in the condominium documents are different than the addresses, but these were the numbers used to identify the units at trial.

only repaired the columns at Unit 40149 and noticed similar concerns at Unit 40154, but that was the extent of his knowledge as to the columns.

As a preliminary matter, some clarification is needed to explain the columns issue. At times, the parties refer to "twenty columns" that need repair, while in other places there are references to "hundreds" of columns that need repair. This discrepancy can be explained as follows: each of the twenty units has several rear decks, and each deck is supported by multiple columns. It cost $72,019.82 to repair all the columns supporting the decks at Unit 40149. Prior to trial, Plaintiffs demanded a total of $1,440,396.40[22] to repair all the columns supporting the decks for all twenty units.

The parties filed a series of motions in limine. One of Zonko's motions was to preclude testimony of Lewis and Walbert regarding the cost of repairs to all the columns. Zonko argued that only one set of columns (Unit 40149) had been inspected and repaired, so any testimony that all columns had to be repaired was too speculative. The court denied the motion in limine, finding that any questions regarding the basis of the witnesses's opinions could be addressed through cross-examination. It appeared to the court then that the testimony at trial would center on how the back decks were all similar, and that similar water damage would likely be found in all the other columns supporting the decks. Also, the speculative nature

---

[22] Calculated as follows: $72,019.82 for the repairs to the one unit, multiplied by twenty units.

of Lewis and Walbert's opinions about the columns was similar to the speculative nature of all the damages in this case, so therefore their opinions were admissible.[23]

At trial, however, the evidence regarding the columns shifted, and Plaintiffs sought damages for columns throughout Salt Meadows, whether or not they supported a deck. First, Lewis testified that there were hundreds of columns that needed repair. Zonko objected, citing *Perry v. Berkley*,[24] but the court denied the motion without prejudice to see if Walbert could add to the testimony.[25]

Walbert's testimony eventually went beyond that of Lewis's testimony. Using exhibits that had already been introduced for other purposes (such as photographs of exterior water damage), Plaintiffs' counsel then led Walbert on an exercise of "count the columns."[26] Walbert dutifully concurred with Plaintiffs' counsel's somewhat leading questions and discovered that there were hundreds of columns, all of which were similar to the deck columns and that apparently all needed to be repaired. However, many, if not most, of these columns were very different from the initial information presented to the court in the arguments over the motion in limine. Some of the columns supported the back decks, but others did not support decks, had different structural functions than the columns supporting

---

[23] By way of example, Zonko's expert inspected only two units and, based on that limited investigation, speculated as to an estimated repair cost for the entire project.

[24] 996 A.2d 1262 (Del. 2010).

[25] Transcript of Trial – Vol. E at E–23-25.

[26] Transcript of Trial – Vol. F at F–165-82, *Salt Meadows Homeowners Assoc., Inc. v. Zonko Builders, Inc.*, (C.A. No. S17C-05-018) (D.I. 284).

the decks, or supported small entryway roofs. Zonko renewed its motion in limine.[27] The court allowed counsel to continue the line of questioning for purposes of making the record, but noted the strong concerns it had regarding this testimony.[28]

The final straw came the day after Plaintiffs engaged in Walbert's column-count exercise and near the end of his *redirect* testimony. Plaintiffs' counsel published to the jury on an overhead projector[29] a worksheet showing that 128 additional columns in total needed repair at a total cost of $4,256,305.28.[30] This demonstrative had not been shown to the court or to opposing counsel, and as soon as the court realized what it contained, the court ordered Plaintiffs' counsel to turn off the projector immediately.[31] Counsel acknowledged that the 128 columns were not testified to until the day before and that she created the demonstrative to reflect the new information from the witness. Plaintiffs argued that the demonstrative was just a summary of what their expert witness had testified to the day prior, and that he had testified that all the repair costs were reasonable and necessary. However, Zonko pointed out that the witness's report about the reasonableness of the repairs was dated November 1, 2019, but the columns were not even inspected until 2020.[32]

---

[27] *Id.* at F–168.
[28] *Id.* at F–167-174.
[29] This projector was referred to as an "Elmo" in the transcript.
[30] Prior to trial, the demand had been for $1.4M for the columns.
[31] Transcript of Trial – Vol. G at G–43-52, *Salt Meadows Homeowners Assoc., Inc. v. Zonko Builders, Inc.*, (C.A. No. S17C-05-018) (D.I. 278).
[32] *Id.* at G–50.

The court stopped this line of questioning and instructed the jury to disregard the demonstrative.[33]

At the conclusion of evidence, Zonko questioned whether evidence regarding the columns would go to the jury.[34] The court denied Zonko's motion for judgment as a matter of law but stated that there would be a separate line on the verdict sheet for the damage to the columns. The court found there was enough testimony to allow the matter to go to the jury, but that it would entertain post-trial argument on the matter and noted that Plaintiffs would have difficulty meeting their burden.[35]

The jury awarded Plaintiffs $1.6M for the costs of future repairs to the columns.

Zonko has renewed its motions for judgment as a matter of law made during trial and seeks entry of judgment in its favor pursuant to Superior Court Civil Rule 50(b), which states:

> Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the Court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. . . . If a verdict was returned, the Court may . . . allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law.

---

[33] *Id.* at G–52.
[34] *Id.* at G–85-87.
[35] *Id.* at G–87.

This court is required to view the evidence in the light most favorable to the nonmoving party.

As a preliminary matter, I note that Plaintiffs had ample time to have Lewis and Walbert investigate the columns further but did not do so. They claimed that because a full investigation required demolition and reconstruction of all the columns, it would be too expensive to undertake. However, Lewis acknowledged that after a cursory inspection he could see possible problems at a second unit, and he agreed that all the decks should be investigated further. Plaintiffs did not undertake even a basic superficial examination, and Plaintiffs vigorously argued against any reopening of even limited discovery.

I find that Zonko's motion for judgment as a matter of law should have been granted and that jury should not have been permitted to award damages for the future column repairs. As mentioned previously, the evidence known to the court at the time of the ruling on the motion in limine was quite different from what was presented at trial. If Plaintiffs had stayed with their initial plan to keep the focus on how the decks were similarly constructed and that similar damage would be expected in each of them, this argument would be a closer issue. But, Plaintiffs went far afield and elicited irrelevant and unfounded opinions from their witnesses. Walbert's testimony was especially concerning when he said all columns in the entire project were similar and likely needed to be repaired. The court observed the

13

testimony and exhibits, and it was obvious to a layman—and should have been obvious to a professional engineer—that most of the 128 columns identified by Walbert were only superficially similar. While they might have been roughly the same width and length, their use in the construction was very different. Put simply, there was no credible evidence that damage to one set of columns supporting a deck would be found in every column in Salt Meadows. Therefore, Zonko's motion is GRANTED.

## C. PLAINTIFFS' MOTION FOR COSTS AND INTEREST

Plaintiffs have filed a motion for costs, prejudgment interest, and post judgment interest. For the following reasons, the motion is GRANTED in part and DENIED in part.

### 1. Costs

Plaintiffs seek the following costs, noted in parentheses:

    a) LexisNexis fees ($4,022.55)

Zonko does not contest these expenses, so they are awarded to Plaintiffs.

    b) Sheriff fees  ($30.00)

Zonko does not contest this expense, so it is awarded to Plaintiffs.

    c) Costs of mediation ($4,646.00)

The parties engaged in three mediations. Plaintiffs dispute that the mediations

were done in good faith.[36] Zonko argues both sides mediated in good faith. As noted

multiple times throughout this litigation, this case is complicated and evolving. The

parties have shared the costs of mediation. The court has discretion on this type of

expense and Plaintiffs have not convinced me to exercise that discretion. Therefore,

no costs related to mediation are awarded.

> d) Deposition of Lambrow ($401.77)

Many witnesses were deposed but Plaintiffs seek costs for the Lambrow

deposition only, which was referred to at trial. Lambrow testified at trial, and the

parties relied on the transcript of the deposition during questioning. The parties

agree the court has discretion to award or not award this cost. Because Lambrow

testified and the deposition itself was not entered into evidence, I decline to award

this cost in this case.

> e) Expert witness fees for Walbert ($10,200.00)

Expert witness fees may be recovered by the prevailing party for the time an

expert testifies or waits to testify, although they are limited to the time the expert

actually spent in court.[37] Reasonable travel time can also be included. In this case,

Plaintiffs' expert billed at $300 per hour.[38] Zonko agrees expert fees should be

---

[36] Transcript of Oral Argument on Oct. 19, 2022 at 10:3-4, *Salt Meadows Homeowners Assoc., Inc. v. Zonko Builders, Inc.*, (C.A. No. S17C-05-018) (D.I. 303).

[37] *Moyer v. Saunders*, 2013 WL 4138116, at *1 (Del. Super. July 24, 2013).

[38] In their motion, Plaintiffs state that Walbert spent 29 hours in court and 10 hours traveling. At $300/hour, it would seem the Plaintiffs would be asking for $11,700.00 instead of the $10,200.00 listed in their motion.

awarded but argues Walbert is entitled to only $3,300.00. Walbert testified as follows: for a short time in the afternoon of May 9, all day on May 10,[39] all day on May 11, and the morning of May 12. In total, I find that Walbert testified or waited for Boyd to testify for twenty-two hours. I will also award two hours of travel time for each of the four days he testified in court. Thus, Plaintiffs are awarded $9,000.00 for their expert witness costs.

    f) Trial exhibits ($4,557.96)

Plaintiffs do not provide any authority for why these expenses are allowable under Superior Court Civil Rule 54(d). Therefore, this expense is not awarded.

    g) Lodging during trial ($3,433.85)

The attorneys on both sides have offices in Wilmington, Delaware. One of the two Plaintiffs' attorneys who tried the case is based in Connecticut. During the trial, Plaintiffs' counsel stayed in a motel near the courthouse and Plaintiffs seek the costs of their lodging. Meanwhile, one of Zonko's attorneys traveled back and forth to Wilmington each day. It is typical in a state the size of Delaware for attorneys to travel to other counties. While being close to the courthouse is a convenience, it is not a necessary expense. Therefore, this cost is not awarded to Plaintiffs.

---

[39] His testimony on this day was interrupted by Zonko's expert, who was not available to testify on other days. Because Walbert deferred his testimony as a courtesy to Zonko and was in court during Boyd's testimony, Plaintiffs are entitled to be awarded his costs for this day.

16

h) Conference room rental ($3,990.00)

For the same reasons costs of lodging are not awarded to Plaintiffs, the costs of a rented conference room are not awarded.

i) Computer exhibit operator ($16,258.45)

During trial, Plaintiffs' counsel often called upon a computer operator to display various exhibits, and to focus in on certain aspects of those exhibits. Plaintiffs argue that the trial was complex with a large number of exhibits. Zonko points out that Plaintiffs could have easily handled the exhibits and used the existing technology in the courtroom. Zonko claims the computer operator was an unnecessary expense. While there were times during the trial where the computer operator did not do much, I agree with Plaintiffs that the operator helped to keep the multitude of documents organized and readily available for witnesses. Therefore, this amount is awarded to Plaintiffs.

## 2. Prejudgment interest

Plaintiffs seek prejudgment interest pursuant to 6 *Del. C.* § 2301(d).[40] Zonko does not contest that Plaintiffs met the statutory prerequisites in that they made a

---

[40] This section reads as follows: "In any tort action for compensatory damages in the Superior Court or the Court of Common Pleas seeking monetary relief for bodily injuries, death or property damage, interest shall be added to any final judgment entered for damages awarded, calculated at the rate established in subsection (a) of this section, commencing from the date of injury, provided that prior to trial the plaintiff had extended to defendant a written settlement demand valid for a minimum of 30 days in an amount less than the amount of damages upon which the judgment was entered."

settlement offer, kept the offer open for thirty days, and the jury awarded more than the offer. However, the parties dispute how prejudgment interest should be calculated. Unfortunately, the statute and cases that have considered it do not provide clear guidance for situations such as the present one.

Plaintiffs argue that prejudgment interest must start as of the date of the tort, and that in this case the tort occurred on the date of the negligent construction. Construction on Salt Meadows took several years but was completed on April 11, 2007. Plaintiffs therefore seek interest from April 11, 2007 until the date of the verdict, May 12, 2022. By their calculations, the prejudgment interest would be $21,907,910.96.[41] They argue that their position is supported by the unambiguous language of 6 *Del. C.* § 2301(d) and all the cases that have applied that statute.

Zonko argues that prejudgment interest is not supposed to be punitive, but to provide "full compensation to the [p]laintiff for the loss of [use of] his or her money and to force the defendant to give up the benefit of retaining money in the interim."[42] In this case, the damage from the negligent construction was discovered in February 2016—nine years after the construction was completed—and Plaintiffs did not start spending money to repair those damages until June 2016. And, as of the date of

---

[41] According to Plaintiffs, the legal rate as of April 11, 2007 was 11.25% and there were 5,510 days between April 11, 2007 and May 12, 2022.
[42] Resp. of Zonko Builders, Inc. to Pls.' Mot. for Costs and Interest at 2 (D.I. 289).

18

trial, Plaintiffs had spent only approximately $2.4M. The bulk of the jury's award is for future damages that had not even been incurred as of the date of trial.

During oral argument on this motion, the parties elaborated on their positions. Plaintiffs argue that the purpose of 6 *Del. C.* § 2301(d) was to encourage settlement and that a plaintiff is not entitled to prejudgment interest only when that plaintiff has paid expenses. They emphasize that even before the damage was found in 2016, the negligent construction negatively affected their properties. And, after the damage was discovered, Plaintiffs were harmed by not being able to sell their houses and lost their "time value" of money. Plaintiffs argue that when Zonko made the decision to reject the settlement offer and go to trial instead, it knew that it risked a significant award of prejudgment interest.

Zonko points out that 6 *Del. C.* § 2301(d) specifically uses the phrase "date of injury" as the beginning point for calculating prejudgment interest. It argues that none of the cases interpreting 6 *Del. C.* § 2301(d) considered the date of injury. In most instances—and, Zonko argues, in all of the cases cited by Plaintiffs—the tort and injury occur simultaneously. But, if the legislature intended that the date of the tort be the starting point for calculating prejudgment interest, then it would have used "tort" instead of "injury" in the phrase "date of injury." Zonko also argues no trial testimony supports Plaintiffs' speculation that either the tort or the injury occurred at the time of construction.

19

Zonko points out that the oft-cited idea that the purpose of 6 *Del. C.* § 2301(d) is to encourage early settlement of cases is undercut by the fact that Plaintiffs did not extend an offer until litigation had been ongoing for one and a half years. Zonko claims it could not find any support in the legislative history of the statute that the legislature intended 6 *Del. C.* § 2301(d) to encourage early settlement, but that courts have simply repeated that rationale without explanation. Zonko ultimately claims that February 2016—the date of discovery of the damage—is the date that should be used.[43] It also argues that, in the alternative, the court could order prejudgment interest based on the money expended each year for repairs.[44]

As stated many times throughout this litigation, this case is unique. In this particular situation, and without the benefit of guidance from prior cases, I accept Zonko's argument that "the date of injury" is the date when the damages were discovered for purposes of calculating prejudgment interest under 6 *Del. C.* § 2301(d).[45] That statute could have used the term "tort" instead of "injury" if the

---

[43] Transcript of Oral Argument on Oct. 19, 2022 at 49.

[44] Because Salt Meadows is largely used only in the summers, the repair work generally took place during the winter months. As part of the litigation, Plaintiffs created a spreadsheet that showed how much money was spent in each of the five years that repairs were done.

[45] The court has considered several options for the date from which prejudgment interest should be calculated. First, it could accept Plaintiffs' argument that the injury happened at the same time as the tort—*i.e.,* the negligent construction—that began roughly when Zonko completed the construction. It could also adopt either of Zonko's theories, that the starting date is the date of discovery of the damage—*i.e.,* injury—or award interest on the amounts Plaintiffs spent each year. I also considered alternative dates that could be used, such as the time that Plaintiffs made Zonko aware of the problems and Zonko refused to undertake any repairs, or the date that Plaintiffs started paying for the repairs, or the date Plaintiffs filed the complaint.

legislature intended the date of the tort to be the starting point for prejudgment interest.[46] I find no merit to Plaintiffs' argument that they are entitled to over $21M in prejudgment interest that accrued when they were happily occupying and using their units for nine years. At least some of the current plaintiffs purchased their units several years after they were constructed; it seems clear to me that they should not be awarded prejudgment interest back before they even owned the damaged units.

### 3. Post-judgment interest

The parties agree that Plaintiffs must be awarded post-judgment interest, which is to be calculated at the rate in effect on the date judgment was entered.[47] Therefore, interest at the applicable rate on May 12, 2022 shall be awarded, based upon the rulings in this motion.

## III. CONCLUSION

The parties are to confer and submit a form of order consistent with the above rulings. I am available if the parties need further clarification or ruling on any issues necessary to complete that form of order.

---

[46] I do not agree with Zonko's alternative proposal to pay prejudgment interest only on what the Plaintiffs' expended. The legislature could have crafted 6 *Del. C.* § 2301(d) to state that prejudgment interest is due only on monies expended by plaintiffs in a tort action, but it did not do so. And, that argument is against the weight of cases that have interpreted 6 *Del. C.* § 2301(d).

[47] *Noranda Aluminum Hldg. Corp. v. XL Ins. America, Inc.*, 269 A.3d 974, 978 (Del. 2021).

**IT IS SO ORDERED.**

*/s/ Robert H. Robinson, Jr*
Robert H. Robinson, Jr. Judge